Filed 8/7/24  P. v. Maldonado CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>NICHOLAUS MALDONADO,<br><br>    Defendant and Appellant. | F085569<br><br>(Super. Ct. No. 19CR-04148B)<br><br>**OPINION** |

APPEAL from a judgment of the Superior Court of Merced County.  Carol K. Ash, Judge.

Charles M. Bonneau, Jr., under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Darren K. Indermill and John W. Powell, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

# INTRODUCTION

Appellant Nicholaus Maldonado was convicted of first degree robbery committed by two or more people (Pen. Code,[1] § 213, subd. (a)(1)(A), count 1) and active participation in a criminal street gang (§ 186.22, subd. (a), count 3.)[2] As to count 1, the jury found that Maldonado personally used a firearm in the commission of the offense (§ 12022.53, subds. (b), (e)(1)), and that he committed the crimes for the benefit of, at the direction of, or in association with a criminal street gang, with the specific intent to promote, further, or assist in criminal conduct by gang members (§ 186.22, subd. (b)(1), (b)(4)). The trial court struck the firearm enhancement and sentenced Maldonado to a prison term of 15 years to life.

Maldonado raises the following claims on appeal: (1) The trial court abused its discretion by declining to declare a mistrial when some of the prospective jurors articulated fears of criminal street gangs during voir dire. Maldonado further contends the trial court erred by denying trial counsel's request to empanel a new jury for the gang phase of his trial following an instance of juror misconduct. (2) There is insufficient evidence to support the criminal street gang enhancement and the substantive gang offense because the gang for which Maldonado had acted to benefit derived only a reputational benefit from the crime. (3) The trial court prejudicially erred by admitting evidence of Maldonado's tattoos, all of which were acquired after his arrest for the instant offense. (4) The trial court prejudicially erred by excluding evidence of a drug trafficking case pending against the victim of the home invasion, A.K. (5) The matter must be remanded back to the lower court for reconsideration of the base term under the

---

[1] All undefined statutory citations are to the Penal Code unless otherwise indicated.

[2] We refer to count 1 as a home invasion throughout the remainder of this opinion.

2.

current language of section 654.  Finding Maldonado's claims meritless, we affirm the judgment of conviction.

## PROCEDURAL AND FACTUAL HISTORY

On September 1, 2020, the Merced County District Attorney filed an information charging Maldonado and codefendant Daiquan Labari Kelly with robbery committed by two or more people (§ 213, subd. (a)(1)(A), count 1), home invasion robbery (§ 211, count 2), and active participation in a criminal street gang (§ 186.22, subd. (a), count 3). The information further alleged that counts 1 and 2 were committed for the benefit of, at the direction of, or in association with a criminal street gang with the specific intent to promote, further, or assist in criminal conduct by gang members (§ 186.22, subd. (b)(1)(C), (b)(4)(B)), and that Maldonado personally used a firearm in the commission of the offense (§ 12022.53, subds. (b), (e)(1)).

On August 25, 2022, the trial court granted Maldonado's motion to bifurcate the substantive gang offense and the gang enhancements from the remaining charges pursuant to section 1109.

On September 1, 2022, the jury was sworn in.

On September 9, 2022, hours after deliberations began, the jury found Maldonado and Kelly guilty on count 1.  No verdict was rendered on count 2, and that count was subsequently dismissed.

On September 22, 2022, following the conclusion of the gang phase of the trial, the jury convicted Maldonado and Kelly on count 3 and found true the gang enhancement and firearm use enhancement allegations.[3]

On December 16, 2022, the trial court sentenced Maldonado to a prison term of 15 years to life on count 1, and a concurrent term of 16 months on count 3.  The court exercised its discretion to strike the firearm use enhancement.

---

[3] Kelly is not a party to this appeal.

A timely notice of appeal followed.

**The Home Invasion (Phase I)**

In 2019, A.K. lived in a two-story house in Merced. The lower level of the house included a kitchen, living room, two bedrooms, and a large sliding glass door leading to the backyard, while the upper level housed three or four bedrooms. A.K.'s roommates, who were college students, were away for the summer.

On July 30, 2019, while A.K. was asleep in his upstairs bedroom, he was awakened sometime between 5:00 a.m. and 6:00 a.m. by loud banging sounds downstairs. Peering out of his bedroom window, he observed four to six individuals in his backyard, some of whom were carrying guns. One of the men was wearing a red shirt and tan bottoms, but he could not see this man's face. A.K. described the men as light-skinned, but he could not determine whether they were Black or Hispanic.

The men were whispering to each other as they attempted to break through A.K.'s sliding glass door. Following two bangs, an object broke through the door. A.K. dialed 911 and placed his phone on the bed, keeping the line open to a 911 operator. He secured his puppy in his bedroom closet and waited for the intruders to reach his room. Moments later, one of the intruders kicked in A.K.'s bedroom door and entered the room. A.K. overheard one of the men ask where " 'the weed [was] at.' " An unmasked man told A.K. to turn around and pressed a gun against A.K.'s spine.

While A.K. was facing the wall, he could hear the house being ransacked. The intruders took a laptop, a PlayStation gaming console, a Nintendo Switch, and some jewelry. They fled through the front door of the home.

Within five minutes of A.K.'s call to 911, Merced police officers arrived on scene, finding A.K. visibly shaken. Simultaneously, Merced Police Officer Brandon Wilkins pursued a brown Chevrolet Impala fleeing the area at a high rate of speed, eventually stopping the vehicle. Four men were inside: Kelly, who was driving, Daevon

4.

Motshwane, who was sitting in the front passenger's seat, Maldonado, who was sitting behind Kelly, and Marcelino Lorenzo, who was sitting behind Motshwane.

Following a search of the vehicle, officers located items taken from A.K.'s house. A gun with an extended magazine was found underneath Kelly's seat.

A.K. informed responding officers that the man who had pressed a gun to his back resembled an individual who had robbed him at a nearby park just a few days prior to the home invasion. A.K. explained that the man who had robbed him at the park had a black semi-automatic pistol with an extended magazine, the same type of gun that was pressed against him during the home invasion. However, A.K. was unable to identify anyone involved in the home invasion following an in-field show up.

Despite evidence showing that there were at least five people involved in the home invasion, Kelly's vehicle and the occupants therein were the only individuals apprehended.

At trial, A.K. identified Maldonado from a photograph as an individual that had previously visited his (A.K.'s) home as a guest. A.K. explained that Maldonado had smoked marijuana at his home on at least five prior occasions. Although A.K. could not identify Maldonado as one of the intruders, he had strong suspicions that A.K. had participated in the home invasion. A.K. explained that he had only a handful of people over to his house in the short time he had been living there.

Surveillance footage from the inside of A.K.'s home depicted aspects of the home invasion. Sergeant Jeremy Salyers with the Merced Police Department recognized Kelly, who was unmasked, from the surveillance video and identified him as one of the intruders. Sergeant Salyers further observed that Maldonado and Motshwane had dried

mud around the bottom of their shoes, suggesting that they had acted as lookouts during the invasion.[4]

During a recorded jail phone call, Kelly initially admitted to "hitting a lick for some weed," which referred to committing a robbery or a home invasion.

**The Gang Allegations (Phase II)**

### 1. *The Norteño Criminal Street Gang*

Officer Justin Saldivar with the Merced Police Department testified as a gang expert on behalf of the prosecution. Through his training and experience, including conversations with active Norteño gang members, he learned the following: the Norteño street gang operates through various subsets within the city of Merced, including Rebels Before Locs (RBL), Dead End Locs (DEL), Loughborough Locs, Merced Ghetto Boys, and Norteños For Life. There are also Norteño subsets specific to the county of Merced.

The Norteño gang operates in a paramilitary framework, characterized by a structured hierarchy. Members in prison, known as the Nuestra Familia, give orders to the Norteños on the street. Proceeds from criminal activities committed by Norteños on the street, otherwise known as "taxes," are funneled back to the Nuestra Familia. All of the Norteño subsets within the city and county of Merced pay taxes to the Nuestra Familia. Norteño gang members adhere to the 14 bonds, which are a set of 14 rules that govern their conduct. The payment of taxes is incorporated within those rules.

There are approximately 1,200 documented Norteño gang members in Merced County. Norteños signify their membership in the gang by wearing red and using common symbols, including: the Huelga bird; one and four dots, denoting the 14th letter of the alphabet; "XIV"; "X4"; and the Washington Nationals' cursive "W."

---

[4] Photographs of the shoes were taken a year after the home invasion occurred. These photographs did not depict mud around the bottom of the shoes.

Rivals of the Norteños include the Northern Riders, a dropout gang; the Sureños; the Crips; and the Go Bad Bloods.

Officer Saldivar opined that the primary activities of the Norteños include: the possession of weapons, the possession of weapons for sale, the possession of narcotics for sale, robbery, assault, and vehicle theft. To prove that the Norteños have committed a pattern of criminal gang activity, the prosecutor adduced evidence of two predicate offenses:

On July 8, 2017, Livingston Police Detective Taylor Kollmann conducted a traffic stop of a vehicle driven by Irving Castrejon-Gomez. Javier Guardado was seated in the front passenger's seat. Detective Kollmann had contacted Guardado on prior occasions and knew him to be an active Livas Norteño gang member. He had previously observed Guardado associating with other known gang members.

Detective Kollmann searched the vehicle and located marijuana and three small bindles of cocaine. Both Guardado and Castrejon-Gomez were arrested. As a result of this encounter, police officers obtained a search warrant for Guardado's and Castrejon-Gomez's residences.

In Guardado's residence, Merced Police Detective Steven Odom located two rifles, one of which had been stolen; a bag of ammunition; and some gang indicia, including a Norteño drawing that read "three block," the facility where active Norteños are housed at the Merced County Jail. Inside Castrejon-Gomez's residence, officers found ammunition and some red Norteño-related clothing. Guardado was convicted of the unlawful possession of a firearm.

With respect to the second predicate offense, Detective Odom testified that on November 11, 2017, he attempted to initiate a traffic stop of a vehicle in Merced. A police pursuit ensued. At some point, both the driver, Ari Gonzalez-Cardenas, and the front passenger, Christian Palomares, exited the vehicle and attempted to run through an orchard before they were apprehended by police.

7.

At the time of his arrest, Gonzalez-Cardenas was carrying a loaded Glock 22 in his waistband and wearing a red belt with a "P" on the buckle. Officer Odom explained that the "P" referenced Planet Varrio X, a Norteño subset in the city of Planada, a city within Merced County. At the time of their arrest, Officer Odom documented both Gonzalez-Cardenas and Palomares as active Norteño gang members. Gonzalez-Cardenas was subsequently convicted of unlawful possession of a firearm with a gang enhancement.

Officer Saldivar opined that Guardado and Castrejon-Gomez were active Varrio Livas Norteño gang members, citing the circumstances of their offense, the firearms found in their residences, and their self-admissions. As to Cardenas and Palomares, Officer Saldivar opined that they were active Norteño gang members based upon the circumstances of their offense and a self-admission by Gonzales-Cardenas.

### 2. *Maldonado and His Accomplices*

With respect to Maldonado and his accomplices, the prosecutor adduced the following evidence demonstrating their individual membership in the Norteño criminal street gang:

*Maldonado*

Between his arrest and his trial, Maldonado had acquired multiple gang-related tattoos, including: the St. Louis Cardinals " 'LS' " on his left forearm; " 'LST' " on his left arm; " 'Stone City' " on his forehead, a teardrop underneath his left eye, four separate letter " 'L's' " on his body, including one L on his right hand and one on his left hand; the Louis Vuitton "LV" logo tattooed in an unspecified location; and a Huelga bird on his left hand.

Officer Saldivar explained that the St. Louis Cardinals tattoos were references to Livingston, as were the " 'L' "s across Maldonado's body. " 'Stone City' " represented the fact that Maldonado had done time in jail. According to Officer Saldivar, there are different theories as to the gang significance of Maldonado's teardrop, which was not filled in. One of those theories is that the tattoo may signify an unfulfilled goal for the

8.

gang. Officer Saldivar opined that Maldonado got these tattoos after he went to jail because he had earned the right to get them. He explained that only a Norteño gang member would be permitted to acquire the tattoos that Maldonado had acquired.

During a recorded jail phone call, Maldonado gave his brother the password to his Snapchat social media account: "LN." Maldonado stated that his password was "VLN" with the V omitted, remarking, "you know what the VLN stands for." He asked an unidentified male participating in the call to post the message, "Free me." Officer Saldivar explained that this message would publicly communicate that Maldonado had put in work for the gang and that going to jail was a significant accomplishment for gang members, analogizing it to going to college.

Immediately after the home invasion, Maldonado was detained wearing a red Cincinnati Reds baseball logo T-shirt and red and black shoes. Norteño gang members within Livingston often use the Cincinnati Reds to denote their gang affiliation. Because Maldonado later acquired a St. Louis Cardinal tattoo on his forearm, a rival baseball team, Officer Saldivar surmised that Maldonado's Cincinnati Reds t-shirt symbolized his association with the Norteño gang rather than the baseball team.

*Motshwane*

Sergeant Salyers had contacted Motshwane between five and seven times prior to Motshwane's arrest for the home invasion. One of those prior contacts occurred in late August 2017, when Sergeant Salyers responded to a report of a domestic disturbance at Motshwane's home. Motshwane's parents reported that they suspected him of being involved in a gang. During one of Sergeant Salyer's subsequent contacts with Motshwane, Motshwane admitted that he was a Norteño.

On March 10, 2019, Merced Police Officer Arturo DeHoyos testified that he was on patrol when he received a call about a group of juveniles hanging out in a laundry room in an apartment complex. Inside the laundry room, Officer DeHoyos found a gun

9.

with its serial number scratched off.  During this encounter, Motshwane admitted that they were Dead End Locs gang members.

Detective Odom worked in the Gang Violence Suppression Unit for four and a half years.  He had between five to 10 prior contacts with Motshwane, one of which occurred just one month before the instant offense.

During a traffic stop in June of 2019, in the city of Merced, Detective Odom observed Motshwane in a vehicle with other known gang members who were wearing clothing commonly associated with members of the Norteños For Life and the Merced Ghetto Boys criminal street gangs.  The vehicle was in a predominately Norteño gang territory.

After obtaining a search warrant for two of the vehicle's occupants' SnapChat accounts, Detective Odom discovered pictures of Motshwane displaying hand signs representing the Dead End Locs.  One photograph depicted Motshwane with a documented Rebels Before Locs gang member.  The photograph was captioned " 'RBL X DEL,' " which stands for Rebels Before Locs and the Dead End Locs, both Norteño subsets in the city of Merced.

Another photograph depicted Motshwane with three known RBL gang members, all of whom were displaying gang signs.  Motshwane was displaying a double pistol with his hands, representing the Dead End Locs.  Three other photographs depicted Motshwane displaying the same Dead End Locs gang sign.  These photographs also depicted Motshwane with individuals displaying gang signs for the Merced Ghetto Boys, the Norteños For Life, and the overarching Norteño gang.

Detective Odom also described prior contacts with Motshwane during which he observed Motshwane in the company of other Norteño gang members, as well as members of the Bloods.

In May of 2018, Detective Odom documented a contact with Motshwane wherein Motshwane was wearing a black sweater with a red shirt underneath it.  Motshwane was

10.

in the company of two other documented Norteño gang members and a member of the Players Nation Wide Blood gang. Detective Odom opined that Motshwane is an active Dead End Locs Norteño gang member.

### *Lorenzo*

Lorenzo lived within a half-mile radius of Maldonado in the city of Livingston.

In August or September of 2015, Detective Kollman contacted Lorenzo at a park. The park is a known Varrio Livas Norteño hangout. In 2019 or 2020, Detective Kollman observed Lorenzo associating with other known Varrio Livas Norteño gang members.

In January of 2018, Detective Kollman participated in the execution of a search warrant of Lorenzo's residence. At the head of Lorenzo's bed, Detective Kollman found a drawing of a Huelga Bird with the word "Livingston" above it with the S crossed out, signifying disrespect to Sureños.

Lorenzo had a Mongolian style haircut, with a ponytail in the back and his head otherwise shaved. This hairstyle is commonly worn by Norteño gang members.

### *Kelly*

Kelly had no prior documented gang contacts with police. The record does not show that he had any prior convictions, known gang monikers, or prior associations with known gang members.

The jury heard evidence of only one of Kelly's tattoos, the letters "OTM." Merced Police Sergeant Jose Barajas explained that this tattoo may be related to a gang on the East Coast, but he could not be certain that it was gang related. Sergeant Barajas stated that Kelly could be associated with the Norteños, but he did not have enough information to conclude that Kelly was an active Norteño.

On July 30, 2019, the day of the incident, Sergeant Salyers questioned Kelly about the home invasion. Kelly claimed that he was hanging out at a residence nearby when a group of individuals were discussing a plan to rob A.K.'s home. The group was planning to steal narcotics from A.K.'s home and claimed they had previously robbed A.K. Kelly

11.

told Sergeant Salyers that the other individuals with whom he had been detained had heard this conversation as well.

### 3. The Gang Expert's Opinion About the Gang Aspect of the Crime

Based on Maldonado's participation in the home invasion, his attire, and his gang tattoos, Officer Saldivar opined that Maldonado was an active member of the Varrio Livas Norteños.

Regarding Kelly, Officer Saldivar explained that Kelly's use of gang terminology, his refusal to cooperate with law enforcement, and his active participation in the robbery with other known gang members, suggested that Kelly was an active Norteño street gang member.[5] Kelly had only been in Merced for a few months, but he was already associating with known gang members, and he took a leadership role in the home invasion by driving one of the getaway vehicles. According to Officer Saldivar, Norteños only commit crimes with other members of the gang.

With respect to Motshwane, Officer Saldivar asserted that Motshwane was an active Dead End Locs Norteño gang member, citing photographs of Motshwane displaying gang signs, his association with other active gang members, and his prior self-admissions.

Finally, as to Lorenzo, Officer Saldivar maintained that he was an active Varrio Livas Norteño, citing the Huelga Bird drawing in Lorenzo's bedroom with the S scratched out and Lorenzo's Mongolian-style haircut.[6]

In response to a hypothetical mirroring the facts of the instant case, Officer Saldivar asserted that the home invasion was executed for the benefit of and in association with the Norteño criminal street gang. Officer Saldivar explained that the

---

[5] Kelly referred to his accomplices as "his little homies," and referred to the robbery as "hitting a lick."

[6] Motshwane and Lorenzo, both minors at the time of the offense, entered pleas to robbery for their participation in the instant offense.

proceeds from any valuables obtained during the robbery could be used to pay taxes to the gang, which would benefit the gang. Further, the fact that all the perpetrators that were apprehended had acted together in the planning and execution of the home invasion demonstrated that they were acting in association with the Norteño gang.

## DISCUSSION

### I. Maldonado's Motions for a Mistrial

Maldonado asserts that the trial court erred by denying his motions for a mistrial. According to Maldonado, the trial court should have empaneled a new jury for the gang phase of his trial so that he could fully voir dire the potential jurors about their biases regarding criminal street gangs. Maldonado further contends that the entire venire was tainted by some of the prospective comments regarding gangs during voir dire, and that a new jury should have been impaneled following an incident of juror misconduct occurring after the first phase of Maldonado's trial. We find his assertion meritless.

#### A. Background

The trial court granted the parties' motions to bifurcate the non-gang offenses from the gang offenses, observing that bifurcation was required under the law. During voir dire, the prosecutor requested permission from the court to question the jury about their biases concerning criminal street gangs. The prosecutor explained that the jury would ultimately hear and decide both cases, and thus, any potential biases or sympathies by potential jurors about criminal street gangs would be relevant. Trial counsel opposed the prosecutor's request, arguing that section 1109 requires the exclusion of all gang evidence under the circumstances.

In addition, trial counsel represented that he would object to the admission of any gang evidence during the non-gang phase of the trial. With respect to the prosecutor's request to voir dire the jury venire about biases toward gangs, trial counsel represented that 99 percent of prospective jurors would have biases *against* gang members, thus implying that such questioning would be unnecessary.

As to the admission of gang evidence in the non-gang phase of the bifurcated proceeding, the trial court ruled that an offer of proof would be required before the prosecutor could introduce any such evidence. And, as to the prosecutor's request to voir dire the jury about gang biases, the court proposed that it could advise the jury that the charges against the defendants did not relate to gang activity, but that the jurors may hear some mention of gangs in the witness's testimony. The court would ask, " 'Anyone have any familiarity, knowledge or expertise with gangs,' and if so, " 'Could you be fair if you hear testimony a witness was associated with a gang?' " Thereafter, if the parties wanted to question the jurors about gangs, they would need to make a showing as to the relevancy of any such questions.

Consistent with its proposed questions, the court questioned the jury venire about their bias related to gangs as follows:

> "[The Court]: Now, the charges I read to you do not contain any reference to gang activity or any mention of gangs, but you may hear some mention of gangs in the testimony, um, or hear that a witness might be associated with a gang. Um, does anyone have any special familiarity, knowledge, experience or expertise when it comes to gangs?"

In response, the prospective jurors volunteered the following information:

- Juror No. 0392 (Seat No. 7) articulated fears of gang retaliation, adding that they have a young child. The trial court emphasized that the charges were not gang related, but Juror No. 0392 stated that they would subconsciously exercise caution, not knowing what they were getting themselves into.

- Juror No. 2183 (Seat No. 8) commented, "I do have a young child. I do have a wife and we do live on a street where it is a little populated with gang violence, so I would be a little afraid that word would get out, so something of that nature." When the court asked whether this would prevent them from being impartial and keeping an open mind, Juror No. 2183 replied that it would not.

14.

- Juror No. 9870 (Seat No. 17) expressed a bias against gangs based upon the fact that he had recently lost a cousin due to gang violence.

None of the other prospective jurors indicated an issue in response to the trial court's inquiry. However, two other prospective jurors subsequently volunteered the following information:

- Juror No. 5894 (Seat No. 15) volunteered that they had been a probation officer for 16 years and had received some basic training related to gangs. Juror No. 5894 was also the father-in-law of one of the prosecution's witnesses in the case, Detective Kollman.

- Juror No. 8567 (Seat No. 10) stated that they had negative feelings about people with tattoos and stated that they would be a poor fit for the jury. At the time of his trial, Maldonado had visible face and hand tattoos.

During a break, trial counsel observed that five of the 18 prospective jurors had expressed negative responses about gangs, with two claiming that they had extreme fears. Trial counsel moved for a mistrial arguing that the jury panel had been tainted by the prospective jurors articulated fears about gangs.

Following the lunch recess, the trial court denied trial counsel's motion, explaining:

> "[The Court]: I'm going to deny the motion. I think it was appropriate for the Court to go into that subject matter. Obviously, depending on the outcome of this portion of the case, I can't imagine, … either side would want jurors like juror in seat No. 7 … [or] 8 as far as sitting on the bifurcated portion.
>
> "I don't see how else to have a fair jury for both sides in this case without mentioning some topics that will come up; plus, in this case, they're at least going to hear testimony about certain colors and whatever, which is kind of common knowledge to most people, so I don't think a mistrial would be justified, so I'll deny the motion."

Subsequently, the following exchange occurred between trial counsel and Juror No. 0392 (Seat No. 7):

15.

"[Trial Counsel]: … this whole idea about retaliation or trying to find you or remembering where you live or what you do, ages of your kids, I mean, is any of that going to come into your thought process over the next two weeks as I defend [Mr. Maldonado]?

"[Juror No. 0392]: Um, I mean, I think the judge reassured me enough where I'm, like, that's not a worry anymore.

"[Trial Counsel]: Okay. The judge [did] or I did?

"[Juror No. 0392]: The judge."

The trial court excused Jurors Nos. 8567 (Seat No. 10) and 9870 (Seat No. 17). Juror No. 0392 (Seat No. 7) was excused following a preemptory challenge by the prosecutor, and Juror No. 5894 (Seat No. 15) was excused by a preemptory challenge by trial counsel. The trial court later excused Juror No. 2183 (Seat No. 8) for financial hardship.

Trial counsel asked the remaining prospective jurors about biases related to tattoos. The following exchanges occurred:

- Trial counsel asked Juror No. 5482 (Replacement Seat No. 17) whether he could determine Maldonado's guilt beyond a reasonable doubt based solely upon the evidence, and not any personal feelings he may have about Maldonado. Juror No. 5482 commented on one of Maldonado's tattoos, remarking that it appeared to be a gang tattoo, and stated that his cousin had been killed by a gang member in a drive-by shooting. Based upon this experience, Juror No. 5482 represented that he would have a difficult time finding Maldonado not guilty. The trial court excused Juror No. 5482.

- Juror No. 2261 (Replacement Seat No. 14) expressed a dislike for tattoos and stated that they associated Maldonado's teardrop tattoo with murder or gang membership. Juror No. 2261 was excused by the court.

On September 1, 2022, the jury was sworn in.

On September 9, 2022, Maldonado was convicted on count 1.

16.

On September 13, 2022, prior to the commencement of the gang portion of the bifurcated trial, trial counsel moved to empanel a new jury to fully voir dire prospective jurors about their gang biases. The prosecutor opposed the motion, arguing that there was no lawful basis to empanel a new jury. She further observed that the trial court had taken appropriate measures to ensure that the jury panel selected had not been prejudiced by any of the gang evidence, consistent with section 1109. The trial court denied trial counsel's motion, explaining:

> "[The Court]: First, I don't think the case against Mr. Maldonado was that weak[.] It's a circumstantial case; but it wasn't a weak case. Secondly, under 1109, there was a bifurcation. The defense counsel objected to me even addressing jurors about the topic of gangs. But I did ask about familiarity. And we did root out – one juror mentioned that made her fearful. So I don't think they would be unduly biased.
>
> "I have advised jurors to follow the law. And I see no grounds for granting the request. And it would take up a lot of time. It took a while for us to pick this jury. So I would think it would take just as long to empanel a new jury. So, at this time, I don't think there's grounds to grant the motion. So, I'll deny it."

The following afternoon, outside of the presence of the jury, the trial court stated that a court bailiff had "overhead [the] jurors discussing gangs." The courtroom bailiff, Deputy Alfred Vasquez, was called to testify. Deputy Vasquez testified that he was walking across the lobby when he heard someone, later identified as the juror in Seat No. 8, "talking about gangs, different gangs, southern gangs, northern gangs, [B]lack gangs, [A]sian gangs." Though he could not be sure, Deputy Vasquez thought that there may have been four or five jurors in the area at the time.

Juror No. 6999 (Seat No. 8) was brought into the courtroom and asked whether he recalled having any conversations with other jurors about gangs. Juror No. 6999 claimed

that he could not remember anything specific.  He admitted that there "might have been" some general discussion of gangs including some discussion of there being "six major gangs at Golden Valley High School."

All of the jurors were questioned about the gang conversation.  Juror No. 4399 (Seat No. 9), admitted having contributed to a discussion about gangs, stating, "I just remember somebody mentioning, like something about a gang somewhere.  …  I made a comment, … 'Well, I didn't know gangs were so prevalent like that.' I can't even remember which [juror] mentioned a gang."  Juror No. 4399 explained that his only contribution to the discussion was stating that he had been naïve about gangs.

Juror No. 8535 (Seat No. 12) heard some discussion of a gang known as "Levi." Juror No. 1475 (Seat No. 13) reported hearing a discussion in the lobby involving the jurors in seat Nos. 1, 8, 9, and 12, and one of those jurors had remarked that "he didn't know that so many towns have local gangs."  None of the other jurors remembered hearing anyone discussing gangs.

The trial court concluded that the gang discussion mainly involved Juror Nos. 6999 (Seat No. 8) and 4399 (Seat No. 9).  The court stated, "Maybe some of the other ones were listening.  So I don't know how Counsel wants to proceed.  It doesn't sound like it was directly on the case, but they were talking about a subject that was involved in this case.  And I do feel like perhaps Juror No. 8 was not totally forthcoming."

Trial counsel argued that the jury had been tainted by the jurors' discussion of gangs and moved for a mistrial as to the bifurcated proceeding.  The trial court denied trial counsel's motion, excused Juror No. 6999 (Seat No. 8), and replaced them with an alternate juror identified as Juror No. 1475.

### B.  Standard of Review

"In general, 'a motion for mistrial should be granted only when " 'a party's chances of receiving a fair trial have been irreparably damaged.' " ' " (*People v. Bell* (2019) 7 Cal.5th 70, 121.)  " 'A trial court should declare a mistrial only " 'if the court is

apprised of prejudice that it judges incurable by admonition or instruction.' " ' " (*Ibid*.; accord, *People v. Ramirez* (2022) 13 Cal.5th at 997, 1126.)

" '[W]e use the deferential abuse of discretion standard to review a trial court['s] ruling denying a mistrial.' " (*People v. Clark* (2011) 52 Cal.4th 856, 990; accord, *People v. Ramirez, supra,* 13 Cal.5th at p. 1126.) "[T]he trial court possesses broad discretion to determine whether or not possible bias or prejudice against the defendant has contaminated the entire venire to such an extreme that its discharge is required." (*People v. Medina* (1990) 51 Cal.3d 870, 889.) We will find an abuse of discretion only where " ' "[the court's] ruling 'falls outside the bounds of reason' " ' " (*People v. Thomas* (2011) 52 Cal.4th 336, 354-355.)

### C. Legal Principles

Under the federal and state constitutions, criminal defendants have the right to a fair trial before an impartial jury. (Cal. Const., art. I, § 16; *see People v. Mataele* (2022) 13 Cal.5th 372, 402-403.) " 'The Sixth Amendment right to an impartial jury and the due process right to a fundamentally fair trial guarantee to criminal defendants a trial in which jurors set aside preconceptions, disregard extrajudicial influences, and decide guilt or innocence "based on the evidence presented in court." ' " (*People v. Mataele*, at pp. 402-403, citing *Skilling v. United States* (2010) 561 U.S. 358, 438.)

" '[P]art of the guarantee of a defendant's right to an impartial jury is an adequate voir dire to identify unqualified jurors. [Citations.] "Voir dire plays a critical function in assuring the criminal defendant that his [constitutional] right to an impartial jury will be honored. Without an adequate voir dire the trial judge's responsibility to remove prospective jurors who will not be able impartially to follow the court's instructions and evaluate the evidence cannot be fulfilled." ' " (*People v. Mataele*, *supra,* 13 Cal.5th at pp. 403, quoting *Morgan v. Illinois* (1992) 504 U.S. 719, 729-730.)

"[T]he trial court possesses broad discretion to determine whether or not possible bias or prejudice against the defendant has contaminated the entire venire to such an

extreme that its discharge is required." (*People v. Medina* (1990) 51 Cal.3d 870, 889.) "[D]ischarging the entire venire is a remedy that should be reserved for the most serious occasions of demonstrated bias or prejudice, where interrogation and removal of the offending venirepersons would be insufficient protection for the defendant." (*Ibid*.) "[S]uch a drastic remedy is [not] appropriate as a matter of course merely because a few prospective jurors have made inflammatory remarks." (*Ibid*.)

### D. Analysis

The trial court granted Maldonado's motion to bifurcate the gang charge and gang allegation from the non-gang offense pursuant to section 1109. Maldonado submits that because the trial court conducted voir dire of the jury with respect to gang biases, "the guilt phase jury was polluted with gang information over defense objection, and yet gang-biased jurors were allowed to serve in the gang phase of the trial." According to Maldonado, empaneling two separate juries was the only way to guarantee his right to a fair trial. We find his assertion unpersuasive.

To begin, subdivision (b) of section 1109 requires the charge of active participation in a criminal street gang to "be tried separately from all other counts that do not otherwise require gang evidence as an element of the crime." (§ 1109, subd. (b).) Although the circumstances of each individual case may dictate whether severance over bifurcation is necessary, there is no universal requirement for severance when the substantive gang offense is charged.[7]

---

[7] " ' "Bifurcation" of a jury trial, …means that different issues in a case will be tried *seriatim* by the *same* jury with the jury returning separate verdicts as to the issues bifurcated.' There is but one trial. "Severance," on the other hand, means that different issues or different defendants in one case have been split off to be tried separately by *different* juries.' " (*People v. Givan* (1992) 4 Cal.App.4th 1107, 1114.) Prior to the commencement of his trial, Maldonado specifically requested bifurcation rather than severance of the gang offenses from the non-gang offenses. It was not until a jury had already been impaneled and he was found guilty during the first phase of his trial did he seek to empanel a second jury.

We recognize that bifurcation may present challenges in its execution, particularly during voir dire, where the prospective jurors' biases about gangs would need to be tested without influencing their perspective on the crime. However, complying with section 1109 while protecting the defendant's right to a fair trial is not the insurmountable task that Maldonado asserts that it is.

The trial court here utilized what we consider to be a suitable approach to assess any biases the prospective jurors may have had concerning criminal street gangs, without revealing the gang aspect of the case. The court clarified that the charges did not reference gang activity, but that jurors may hear some mention of gangs during trial. The court followed this admonition by asking the prospective jurors whether they had any special familiarity, knowledge, experience, or expertise with respect to criminal street gangs, casting a broad net to identify potential biases without tipping its cards.

According to Maldonado, the jury should not have been advised that it may hear gang evidence because such evidence was inadmissible during the first phase of his trial. As the trial court observed however the jury would inevitably hear some evidence from which it could conclude there was a gang element to the case, thus reinforcing the need to assess any potential biases during voir dire. For example, even excluding evidence of the fact that Maldonado was wearing a red shirt and red shoes at the time of his arrest, a known gang color, and that a firearm concealed by a red cloth was found underneath Kelly's seat, Maldonado was covered in visible tattoos on his face and hands, effectively advertising his gang affiliation. Testing the jury's biases about criminal street gangs would serve to protect Maldonado's right to a fair trial during both phases.

Insofar as Maldonado suggests that some of the jurors' articulated fears of gangs tainted the entire jury venire, the record does not support his assertion. Nor does the record contain any evidence to support Maldonado's contention that gang biased jurors were permitted to serve during the second phase of his trial. From the record, none of the prospective jurors who had articulated concerns or negative feelings about gangs or

21.

tattoos were sworn into the jury. These prospective jurors were either dismissed for cause or following preemptory challenges.[8]

Finally, there is no support for Maldonado's assertion that following an isolated instance of juror misconduct a new jury should have been empaneled. When some of the sworn jurors were overheard discussing gangs by the court bailiff, the trial court dutifully questioned the jurors about the alleged misconduct. Juror No. 6999 (Seat No. 8), who had been discussing gangs during a lunch recess, was dismissed as a result. Maldonado fails to persuade us this remedy was insufficient, and that empaneling a new jury was required.

Even assuming error from the denial of Maldonado's motions for a mistrial we find no prejudice upon this record. Because Maldonado's trial was not "fundamentally unfair," the test for prejudice articulated in *People v. Watson* (1956) 46 Cal.2d 818 (*Watson*) applies. (See generally, *People v. Partida* (2005) 37 Cal.4th 428, 439.)

Under *Watson*, reversal is required only if "it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." (*Watson*, *supra*, 46 Cal.2d at p. 836.) While evidence of Maldonado's guilt may have been circumstantial, it was not insufficient to support his conviction. The mud on Maldonado's shoes and his presence in the getaway vehicle support the conclusion that he participated in the home invasion as a lookout. Further, as discussed in part II, *post*, there was also ample evidence showing that he, an active Varrio Livas Norteño gang member, committed the crime with other active Norteño gang members.

---

[8] Maldonado contends that Juror No. 2261, who expressed a dislike of tattoos and opined that Maldonado's teardrop tattoo meant murder, became an alternate juror. However, the trial court excused Juror No. 2261. The record does not show that any of the other jurors shared Juror No. 2261's opinion about tattoos generally or about Maldonado's tattoos specifically.

Maldonado's claim of prejudicial error appears to be premised on the broader proposition that the mere mention of gang charges or questions about views on gangs deprived him of a fair trial. However, while gang evidence may have a highly inflammatory effect on the jury (*People v. Tran* (2022) 13 Cal.5th 1169, 1208), the trial court's inquiry about the jurors' views on criminal street gangs served to protect rather than undermine Maldonado's right to a fair trial. We find Maldonado's assertion to the contrary meritless.

## II. Sufficiency of the Evidence Supporting the Gang Enhancement and the Substantive Gang Offense

Maldonado contends that the evidence was insufficient to support the jury's true findings on the gang enhancement and the substantive gang offense. According to Maldonado, the gang expert testified that the gang garnered a reputational benefit from the home invasion, which is insufficient to prove the gang enhancement under section 186.22, subdivision (b). Although he acknowledges that the expert opined that the gang received a financial benefit from the home invasion, he asserts that the expert's testimony on this point was speculative to aid the jury's determination. Maldonado further asserts that he and his accomplices were convicted solely due to their association with Motshwane. We reject these contentions and conclude that substantial evidence substantiates the jury's findings regarding the gang enhancement and substantive gang offense.

### A. Background

Assuming a hypothetical mirroring the facts of the instant case, Officer Saldivar opined that the home invasion was committed for the benefit of and in association with the Norteño criminal street gang. He explained that the crime was committed by a well-documented Norteño gang member (Motshwane) with two other Varrio Livas Norteños from Livingston (Maldonado and Lorenzo), and an undocumented Norteño (Kelly). Officer Saldivar maintained that because proceeds from the home invasion would be

23.

funneled back to the gang, the crime would benefit the gang financially. He further opined that the crime was committed in association with the Norteño street gang because different documented members of the gang had conspired and then worked together to commit the offense.

### B. Standard of Review

On review for sufficiency of the evidence supporting a conviction, we must " 'examine the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value that would support a rational trier of fact in finding [the defendant guilty] beyond a reasonable doubt.' " (*People v. San Nicolas* (2004) 34 Cal.4th 614, 657-658.)

We must "presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence." (*People v. Jones* (1990) 51 Cal.3d 294, 314.) "The same standard applies when the conviction rests primarily on circumstantial evidence." (*People v. Kraft* (2000) 23 Cal.4th 978, 1053.) "An appellate court must accept logical inferences that the jury might have drawn from the circumstantial evidence." (*People v. Maury* (2003) 30 Cal.4th 342, 396.) "Given this deferential standard of review, a 'defendant bears an enormous burden in claiming there is insufficient evidence' to support a conviction." (*People v. Wear* (2020) 44 Cal.App.5th 1007, 1020.)

Before the judgment of the trial court can be set aside for insufficiency of the evidence to support the verdict of the jury, it must clearly appear that upon no hypothesis whatever is there sufficient substantial evidence to support it." (*People v. Redmond* (1969) 71 Cal.2d 745, 755; *People v. Daugherty* (1953) 40 Cal.2d 876, 885; *People v. Hicks* (1982) 128 Cal.App.3d 423, 429.) Thus, the reviewing court must affirm if any reasonable jury could have found sufficient evidence to sustain the conviction, even if the court might have reached a different conclusion if it had been the initial factfinder.

(*People v. Latham* (2012) 203 Cal.App.4th 319, 334.) "The existence of a mere conflict in the evidence provides no basis for reversal" and is resolved in favor of the judgment. (*Ibid.*)

### C. Legal Principles

Section 186.22 provides for a gang enhancement when a defendant is convicted of an enumerated felony committed "for the benefit of, at the direction of, or in association with a criminal street gang, with the specific intent to promote, further, or assist in criminal conduct by gang members." (§ 186.22, subd. (b)(1).)

"The evidence must establish both of the two prongs to the gang enhancement under section 186.22, subdivision (b)(1)." (*People v. Perez* (2017) 18 Cal.App.5th 598, 606.) " 'First, the prosecution is required to prove that the underlying felonies were "committed for the benefit of, at the direction of, or in association with any criminal street gang." (§ 186.22[, subd. ](b)(1).) Second, there must be evidence that the crimes were committed "with the specific intent to promote, further, or assist in any criminal conduct by gang members." ' " (*People v. Perez,* at pp. 606-607, citing *People v. Rios* (2013) 222 Cal.App.4th 542, 561.)

In contrast, the substantive gang offense under section 186.22, subdivision (a) "does not require that the underlying felony be gang related, but does require that the defendant 'act with another gang member.' [Citation.] And unlike the gang enhancement (§ 186.22(b)(1)), the gang participation offense (§ 186.22(a)) 'does not require a specific intent to further or promote the gang (only knowledge of the gang's pattern of criminal activity).' " (*People v. Rios*, *supra*, 222 Cal.App.4th at p. 561.)

Following the enactment of Assembly Bill No. 333 (2021-2022 Reg. Sess.) (Assembly Bill No. 333), section 186.22 established new requirements for establishing liability under subdivisions (a), (b), and (d). (Stats. 2021, ch. 699, § 3.) As of January 1, 2022, predicate offenses must be shown to have "commonly benefited" the alleged gang, and the common benefit must have been "more than reputational." (§ 186.22, subd.

(e)(1).)  Currently charged offenses no longer qualify (*id.*, subd. (e)(2)), and at least one predicate offense must have been committed "within three years of the date the current offense is alleged to have been committed" (*id.*, subd. (e)(1)).

Among other changes, the terms "benefit," "promote," "further," and "assist" are now defined to mean providing "a common benefit to members of a gang where the common benefit is more than reputational."  (§ 186.22, subd. (g).)  "Examples of a common benefit that are more than reputational may include, but are not limited to, financial gain or motivation, retaliation, targeting a perceived or actual gang rival, or intimidation or silencing of a potential current or previous witness or informant."  (*Ibid.*)

### D. Analysis

#### 1. The Criminal Street Gang Enhancement (§ 186.22, subd. (b))

##### a. Evidence Showing that Maldonado Committed the Home Invasion "for the Benefit of" the Norteños

During the first phase of Maldonado's trial, the prosecutor adduced evidence showing that Maldonado and his accomplices sought to steal marijuana from A.K.  They also stole other valuables from A.K.'s home, including a laptop, a PlayStation gaming console, a Nintendo Switch, and some jewelry.  Officer Saldivar opined that the home invasion would benefit the Norteño street gang because the gang would receive proceeds from the robbery, which was committed by members of various Norteño subsets.  According to Officer Saldivar, all Norteño subsets in the city and county of Merced are required to pay taxes to the gang.

With respect to the perpetrators' intent to steal marijuana, Officer Saldivar explained that the gang's primary source of income is derived from drug trafficking.  Despite marijuana being a legal substance, it is still sold on the black market by gangs.  It can also be used for trade, or it can be funneled into jail.

" 'Expert opinion that particular criminal conduct benefited a gang' is not only permissible but can be sufficient to support [a gang enhancement under] section 186.22,

subdivision (b)(1).” (*People v. Vang* (2011) 52 Cal.4th 1038, 1048.) Based upon the evidence discussed, we conclude that the prosecutor adduced sufficient evidence showing that the home invasion was “ ‘committed for the benefit of, at the direction of, or in association with any criminal street gang.’ ” (§ 186.22, subd. (b)(1).) Specifically, the overarching Norteño street gang.

Evidence of Maldonado’s intent “to promote, further, or assist in any criminal conduct by gang members” (§ 186.22, subd. (b)) is even more straightforward. This prong can be met with evidence that the defendant “intended to help [a fellow gang member] commit a crime.” (*People v. Romero* (2006) 140 Cal.App.4th 15, 20, 43.)

Here, the evidence showed that Maldonado and at least two of his accomplices were active gang members who had preplanned the home invasion. Maldonado had been a guest at A.K.’s home on at least five prior occasions and had smoked marijuana with him. During the course of the home invasion, one of the perpetrators demanded to know the location where A.K. stored his marijuana, implying prior knowledge that A.K. kept marijuana within his home. Further, Kelly was identified as one of the perpetrators that had been inside of A.K.’s home, whereas, Maldonado and Motshwane purportedly acted as lookouts based upon the mud on their shoes. They also fled from the home invasion in the same vehicle. From this evidence, the jury could reasonably infer that Maldonado and his accomplices relied upon each other as fellow gang members to facilitate the robbery, and thus, that Maldonado intended to help fellow gang members commit the crime. (See *People v. Romero*, *supra*, 140 Cal.App.4th at pp. 20, 43.)

Maldonado contends that the prosecutor erred by allowing Officer Saldivar to testify that Maldonado would benefit reputationally from the home invasion. Officer Saldivar testified, in relevant part, that “[r]espect is everything to the gang members,” that a gang member generally wants to be respected by his peers and the community, and that if that individual is feared, such fear would enable that gang member to accomplish other crimes. While a reputational benefit is no longer sufficient to support the criminal

27.

street gang enhancement under subdivision (g) of section 186.22, the prosecutor never argued as much, nor did the jury instructions endorse this now invalid theory.

The prosecutor made the following statements during her closing argument: "Another benefit that Officer Saldivar talked about was the intimidation here. And you, as the finder of fact, will have to determine if the home-invasion robbery benefited the gang. If you think that … as fact finder, find that the video surveillance, five men armed with guns, rifles, extended magazine clips is intimidating, you find if [A.K.] was intimidated." Although her comments lack clarity, the prosecutor referenced Officer Saldivar's testimony about gang intimidation for purposes of arguing that aspects of the home invasion were intended to intimidate a "potential current … witness." (§ 186.22, subd. (g).)[9] We reject Maldonado's attempt to recast the prosecutor's statements as an improper argument that a reputational benefit could support the gang enhancement.

During closing argument, the prosecutor stated that "[t]he common benefit … is more than reputational, and Officer Saldivar talked about that a lot." Further, the jury was explicitly instructed pursuant to CALCRIM No. 401, which incorporated Assembly Bill No. 333's amendments to section 186.22.[10] This instruction provides: "To benefit, promote, further, or assist [a criminal street gang] means to provide a common benefit to the members of a gang where the common benefit *is more than reputational*." (Italics

---

[9] Maldonado asserts that there was no evidence showing that the home invasion had the intended effect of intimidating or silencing a witness. While we agree that the evidence fails to show the home invasion was intended to silence a potential witness, we find no prejudice as a result of the prosecutor's advancement of this theory. An instruction on a factually unsupported theory of guilt is prejudicial only where "a review of the entire record affirmatively demonstrates a reasonable probability that the jury in fact found the defendant guilty solely on the unsupported theory." (*People v. Guiton* (1993) 4 Cal.4th 1116, 1130.) The record here does not demonstrate a reasonable probability that the jury relied upon the prosecutor's theory that the crime was intended to or actually intimidated a witness.

[10] Maldonado was tried in September of 2022, more than nine months after Assembly Bill No. 333 went into effect.

28.

added.)  Thus, even if the jury interpreted the prosecutor's comments in the manner Maldonado suggests they must have, we presume that the jury followed the trial court's instructions, and not the prosecutor's comments in closing argument.  (*People v. Centeno* (2014) 60 Cal.4th 659, 676 [it is " ' "presum[ed] that jurors treat the court's instructions as a statement of the law by a judge, and the prosecutor's comments as words spoken by an advocate ... attempt[ing] to persuade," ' " if a prosecutor's " 'argument runs counter to instructions given a jury, [appellate courts] will ordinarily conclude that the jury followed the latter and disregarded the former' "].)

In a single sentence, Maldonado further contends that "There was no effort to demonstrate a financial benefit from the predicate gang offenses."  Not so. The prosecutor proffered two different theories as to how the crimes committed by the subjects of the predicate offenses benefited the Norteño street gang.

First, Officer Saldivar opined that the sale of drugs would benefit the Norteño gang by generating income for the gang and that drug sales are one of the primary money-making activities of the gang.  As Varrio Livas Norteño gang members, Castrejon-Gomez and Guardado would be required to pay taxes to the Nuestra Familia, the prison arm of the Norteño gang, from the proceeds of their drug sales.  From this evidence, the jury could conclude that their crime would financially benefit the Norteño street gang.

Second, Officer Saldivar posited that a Norteño gang member armed with a firearm could benefit the gang because the firearm could be used against rival gang members.  He explained that firearms are essentially tools that gang members use to commit other crimes, such as a robberies, or for self-defense against rival gang members. While we concede that the possession of a firearm by a gang member may not provide as direct a benefit as drug sales that generate revenue for the gang, it nonetheless holds potential utility.  Gonzales-Cardenas was shown to be an active Norteño, and he admitted to a criminal street gang enhancement in the commission of the unlawful possession of a

firearm, a crime which was opined to be one of the primary activities of the Norteños, we do not consider Maldonado's claim further, particularly considering Maldonado's failure to develop his argument.

### b. Evidence Showing that Maldonado Committed the Home Invasion "In Association With" the Norteño Criminal Street Gang (§ 186.22, subd. (b))

"A crime is committed in association with a gang if the 'defendants relied on their common gang membership and the apparatus of the gang in committing' the charged felonies." (*People v. Garcia* (2016) 244 Cal.App.4th 1349, 1367, quoting *People v. Albillar* (2010) 51 Cal.4th 47, 60.) This conclusion can be demonstrated by the "fact that [a] defendant committed the charged crimes in association with fellow gang members." (*People v. Morales* (2003) 112 Cal.App.4th 1176, 1198.) However, neither the gang enhancement nor the substantive gang offense require proof that the defendant is an active gang member. (See *People v. Villa-Gomez* (2017) 9 Cal.App.5th 527, 541 ["Like the gang enhancement, a defendant need not be a member of the gang to be convicted of active participation in a criminal street gang under section 186.22, subdivision (a)"].)

We conclude that the record contains substantial evidence demonstrating that Maldonado was an active Varrio Livas Norteño who came together with other Norteño gang members to commit the home invasion. Officer Saldivar opined that Motshwane was an active member of the Dead End Locs, and that he regularly associated with members of other Norteño subsets. The prosecutor adduced evidence of Motshwane displaying gang signs in videos and photographs, and prior police contacts wherein Motshwane was associating with other gang members.

While the evidence showing that Lorenzo was an active gang member was not as compelling, it was nonetheless sufficient. Detective Kollman, who was personally familiar with Lorenzo, testified that during a search of Lorenzo's home, a drawing depicting a Huelga bird with the word "Livingston" was found in Lorenzo's room.

30.

Detective Kollman also observed Lorenzo associating with other Varrio Livas Norteño gang members sometime between 2019 and 2020. Finally, Lorenzo wore a Mongolian-style haircut, which is commonly worn by Norteño gang members.

With respect to Maldonado, his post-arrest jail phone call, tattoos, and association with other known gang members provided substantial evidence of the fact that he was an active Varrio Livas Norteño gang member. One week after the robbery, Maldonado made a recorded jail call asking an acquaintance to log into his Snapchat account using the password "LN," to post about his (Maldonado's) incarceration. As Officer Saldivar explained, Norteño gang members often publicize their incarceration as an achievement.

Although Maldonado had no tattoos prior to his arrest, he acquired at least six gang tattoos following his incarceration for the home invasion. Officer Saldivar opined that Maldonado was permitted to obtain gang tattoos because he had put in work for the gang. Officer Saldivar explained that if Maldonado had not earned the right to acquire the tattoos that he had acquired, he would have been assaulted or killed by other Norteño gang members. The jury could conclude that Maldonado was permitted to obtain his tattoos as an achievement for committing the home invasion.

Drawing all reasonable inferences in favor of the judgment (see *People v. Rodriguez* (1999) 20 Cal.4th 1, 11), we further conclude that the evidence demonstrated that Maldonado and his accomplices worked together to execute the home invasion, relying upon their common gang membership. To clarify, " '[s]ubstantial evidence is evidence sufficient to "deserve consideration by the jury," that is, evidence that a reasonable jury could find persuasive.' " (*People v. Landry* (2016) 2 Cal.5th 52, 120, quoting *People v. Barton* (1995) 12 Cal.4th 186, 201, fn. 8.) It is "evidence which, when viewed in light of the entire record, is of solid probative value, maintains its credibility and inspires confidence that the ultimate fact it addresses has been justly determined." (*People v. Conner* (1983) 34 Cal.3d 141, 149.)

As discussed, there was evidence that the robbery had been planned. Maldonado had visited A.K.'s house on at least five prior occasions to smoke marijuana. When one of the perpetrators of the home invasion confronted A.K. at gunpoint, he demanded to know where A.K. kept his marijuana. Some of the perpetrators also showed up armed, masked, and wearing gloves, further suggesting planning and coordination.

There was also evidence that perpetrators had predefined roles in the home invasion. Some of the men, including Kelly, went inside the home to look for valuables, while others, including Motshwane and Maldonado, stayed outside to act as lookouts. Further evidence of the fact that the perpetrators acted together was that they were apprehended fleeing the scene of the crime while traveling in the same vehicle.

Despite this evidence, Maldonado argues that he was found guilty of the gang allegation and substantive gang offense based solely upon his association with Motshwane. Based upon the evidence discussed above, the likelihood that Maldonado was convicted based solely upon a "guilt by association" theory versus his actual participation in the home invasion as an active gang member himself, are infinitesimal. Because Maldonado's assertions to the contrary rest upon inferences from the evidence that are contrary to the jury's findings, we summarily reject his argument. (*People v. Hicks* (1959) 175 Cal.App.2d 556, 557 ["The well-established rule requires an appellate court to resolve all conflicts in the evidence, and to draw all reasonable inferences, in favor of the judgment. It is only when the evidence, so viewed, is insufficient to sustain the finding of the trier of the facts that reversal upon this ground is warranted"].)

Finally, relying upon our Supreme Court's decision in *People v. Prunty* (2015) 62 Cal.4th 59 (*Prunty*) and Assembly Bill No. 333's amendments to section 186.22, Maldonado submits there was insufficient evidence to support the conclusion that the

home invasion was committed to benefit the overarching Norteño street gang. However, neither *Prunty* nor Assembly Bill No. 333 assist Maldonado.[11]

"[T]he criminal street gang that is shown to exist under section 186.22, subdivision (f) must be the same criminal street gang with which the defendant acted in association or sought to benefit in the commission of his crimes." (*People v. Franklin* (2016) 248 Cal.App.4th 938, 950, citing *Prunty, supra,* 62 Cal.4th at pp. 72-76 & fn. 3.) Here, the gang for which Maldonado and his accomplices acted to benefit was the Norteño criminal street gang within the county of Merced. Maldonado and Lorenzo were shown to be active Varrio Livas Norteños, while Motshwane was shown to be a member of the Dead End Locs. Although there was minimal evidence supporting the conclusion that Kelly was an active Norteño gang member, there was sufficient evidence showing that he was associated with the Norteños. As Officer Saldivar testified, gang members only commit a crime with members of their same gang.

Officer Saldivar stated that all Norteño subsets within the city and the county of Merced are required to pay taxes. These taxes, which come from criminal activities, such as robberies, are subsequently funneled back to the Nuestra Familia. Norteño subsets also follow the "14 bonds," a set of rules, which incorporates the requirement that members must pay taxes to the Norteño gang. The fact that the Norteño subsets within

---

[11] Although Maldonado relies upon *Prunty* to support his claim, he does not raise a claim of error specifically under *Prunty*. In *Prunty*, our Supreme Court held that "where the prosecution's case positing the existence of a single 'criminal street gang' for purposes of section 186.22(f) turns on the existence and conduct of one or more gang subsets, then the prosecution must show some associational or organizational connection uniting those subsets." (*Prunty*, *supra,* 62 Cal.4th at p. 71.)

Maldonado and Lorenzo were shown to be Varrio Livas Norteño gang members, and the subjects of the predicate offenses were shown to be either Varrio Livas Norteño gang members or members of the overarching Norteño street gang. The evidence adduced at trial showed that Varrio Livas Norteño was organizationally connected to the overarching Norteño street. Because Maldonado did not raise a "classic" *Prunty* claim, we do not address its application to this case further.

33.

Merced County conform to the same rules and are expected to pay taxes to the Nuestra Familia demonstrates that they are part of the same hierarchical organization. (See *Prunty, supra*, 62 Cal.4th at p. 77.)

Maldonado observes that Officer Saldivar was unable to explain how money from criminal activities are funneled back to the Nuestra Familia. That is not a correct representation of the record. At trial, counsel asked Officer Saldivar whether he had seen any bank accounts through which the Nuestra Familia could access funds from criminal endeavors. Officer Saldivar began to explain that funds from criminal activities would not be deposited in a bank account, but trial counsel interrupted before he could finish his explanation. Nonetheless, the fact that Officer Saldivar did not explain precisely how money is funneled back to the Nuestra Familia did not foreclose the jury from concluding that Norteño gang members in fact pay taxes to the gang.

Officer Saldivar's testimony that *all* Norteño subsets in Merced County pay taxes from the commission of crimes allowed the jury to conclude, without speculating, that the subset to which Maldonado claimed membership to, Varrio Livas Norteño, was also required to pay taxes. After all, these subsets "all align together as Norteños," their members identify themselves as Norteños, and they follow the Norteño code of conduct.

Maldonado further contends that following the enactment of AB 333, evidence of his friends and neighbors, as well as his physical proximity to his accomplices, was insufficient to establish a gang association. We agree that standing alone, evidence of Maldonado's contacts as well as the fact that he lived within close proximity to Lorenzo would be insufficient to show that he acted in association with the Norteños. But as discussed, that was not the sum total of the evidence showing that the defendants were active gang members.

### 2. *Evidence Supporting the Substantive Gang Offense (§ 186.22, subd. (a))*

Maldonado's challenge to the substantive gang offense appears to be identical to his challenge to the jury's true finding on the gang enhancement (§ 186.22, subd. (a)). As discussed in part II.1 *ante*, we conclude that his claims are without merit. We do not repeat our analysis here.

## III. Evidence of Maldonado's Post-Arrest Tattoos

Maldonado further contends that the trial court abused its discretion by ruling that evidence of his tattoos, acquired after he was arrested for the home invasion, was admissible. We disagree.

### A. Background

Maldonado acquired multiple tattoos in the three years following his arrest. Because of the gang implications of these tattoos, the prosecutor sought to introduce photographs of Maldonado's tattoos into evidence to demonstrate that Maldonado was an active gang member. The trial court granted the prosecutor's request to have Maldonado's tattoos photographed but reserved ruling whether evidence of the tattoos were admissible.

During an in limine hearing, the prosecutor made an offer of proof explaining that the gang expert would testify that not just anyone would be permitted to acquire the type of tattoos that Maldonado had acquired. During an Evidence Code section 402 hearing, Officer Saldivar testified that Maldonado's tattoos were gang related. He further explained that not just anyone would be permitted to get the type of tattoos that Maldonado had acquired. Rather, that individual would have to earn the right to do so by putting in work for the gang. According to Officer Saldivar, if a person housed in the Norteño wing of the county jail had not earned the right to acquire similar tattoos, they may be assaulted or killed by other Norteño gang members.

Trial counsel argued that evidence of Maldonado's tattoos bore little relevance to the instant crimes because Maldonado had acquired his tattoos after the home invasion. Trial counsel further asserted that Maldonado had acquired his tattoos while he was in survival mode, opining that he had likely done so to assimilate into the gang lifestyle in jail.

Following further argument by the parties, the trial court overruled counsel's objection to the admission of evidence of Maldonado's tattoos. The court found that evidence of Maldonado's tattoos was probative because acquiring those tattoos indicated that he had earned the privilege to get them while in jail. This privilege would not have been granted had Maldonado not put in work for the gang.

### B. Legal Principles

All relevant evidence is admissible (see Evid. Code, § 351), subject to exclusion "if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352; *People v. Cardenas* (1982) 31 Cal.3d 897, 904-905.) Evidence is relevant if it has "[A]ny tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210.)

" ' "In applying [Evidence Code] section 352, 'prejudicial' is not synonymous with 'damaging.' " ' " (*People v. Alexander* (2010) 49 Cal.4th 846, 905.) Rather, prejudice under the statute refers to " ' " 'evidence which uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues.' " ' " (*Ibid*.) " 'In such a circumstance, the evidence is unduly prejudicial because of the substantial likelihood the jury will use it for an illegitimate purpose.' " (*People v. Branch* (2001) 91 Cal.App.4th 274, 286.)

A trial court's decision to admit or exclude evidence is reviewed for an abuse of discretion. (*People v. Brooks* (2017) 3 Cal.5th 1, 43.) "An appellate court cannot reverse

a judgment based on the erroneous admission of evidence unless the admitted evidence 'resulted in a miscarriage of justice.' [Citation] … [A] miscarriage of justice can only be found when the reviewing court determines it is reasonably probable that a result more favorable to the defendant would have been reached had the trial court excluded the erroneously admitted evidence." (*People v. Lapenias* (2021) 67 Cal.App.5th 162, 170, fn. omitted; see *Watson*, *supra*, 46 Cal.2d at p. 836.) The appellant carries the burden of affirmatively demonstrating both error and prejudice. (See *People v. Garza* (2005) 35 Cal.4th 866, 881.)

### C. Analysis

Neither the gang enhancement (§ 186.22, subd. (b)) nor the substantive gang offense (*id.*, subd. (a)), require the prosecutor to prove that the defendant was an active gang member. (See *People v. Ware* (2022) 14 Cal.5th 151, 165, quoting *People v. Rodriguez* (2012) 55 Cal.4th 1125, 1130 [under the gang statutes, " '[m]ere active and knowing participation in a criminal street gang is not a crime' "].) However, evidence showing that Maldonado was an active Norteño gang member at the time of the home invasion was nonetheless relevant for two reasons.

First, evidence showing that Maldonado was an active gang member supported the prosecutor's assertion that the home invasion benefited the gang, because Maldonado would be expected to pay taxes from any proceeds from that crime. Second, such evidence also supported the prosecutor's theory that Maldonado had acted in association with the gang, having committed the crime with at least one other Norteño gang member. (See *People v. Rodriguez, supra,* 55 Cal.4th at p. 1132 ["section 186.22(a) requires that felonious criminal conduct be committed by at least two gang members, one of whom can include the defendant if he is a gang member"].)

As Officer Saldivar explained, a Norteño would have to earn the right to acquire tattoos like those acquired by Maldonado. The jury could reasonably conclude that Maldonado had earned that right after he committed the home invasion. Although the

jury could alternatively conclude that Maldonado's tattoos, all acquired sometime within the three years after he was arrested for the instant offense, had little relevance to his status as a gang member on the day of the robbery, that does not demonstrate that the trial court abused its discretion by admitting this evidence.

Maldonado argues that evidence of his tattoos also violated his Fifth Amendment right against self-incrimination. His entire claim is premised upon his assertion that "[his] tattoos were entirely the product of state action." He provides no proof to support this assertion. Notwithstanding, we conclude that the record fails to demonstrate that Maldonado's Fifth Amendment right was violated by the admission of evidence showing his gang tattoos.

The Fifth Amendment provides that no person "shall be compelled in any criminal case to be a witness against himself." (U.S. Const. Fifth Amend.) In general, the Fifth Amendment protects the accused from compelled verbal statements but can also apply to compelled physical acts which constitute communications. The key distinction as to whether the Fifth Amendment applies is whether the incriminating communications, verbal or physical, are "testimonial" in nature, incriminating, and compelled. (*People v. Ramirez* (2023) 98 Cal.App.5th 175, 197.)

"[I]n order to be testimonial, an accused's communication must itself, explicitly or implicitly, relate a factual assertion or disclose information. Only then is a person compelled to be a 'witness' against himself." (*Doe v. United States* (1988) 487 U.S. 201, fn. omitted.) "It has long been held that the compelled display of identifiable physical characteristics infringes no interest protected by the privilege against compulsory self-incrimination." (*United States v. Dionisio* (1973) 410 U.S. 1, 5-6.) "The Fifth Amendment protects communicative or testimonial evidence, but does not embrace the use of the suspect's body as a source of physical evidence." (*People v. Roberts* (1975) 51 Cal.App.3d 125, 140, see e.g., *State v. Tiner* (2006) 340 Ore. 551, 561-562 [the compelled display of the defendant's tattoos not testimonial].)

Here, evidence of Maldonado's tattoos were not elicited for purposes of identification. Rather, this evidence was used to prove that Maldonado was an active gang member. Assuming evidence of Maldonado's tattoos, which are undoubtedly incriminating, are testimonial under the circumstances, the evidence of his tattoos was not acquired through government compulsion.

Maldonado was covered with gang-related tattoos, and many of them were visible to the jury. He had a teardrop underneath his left eye, " 'Stone City' " across his forehead, a Huelga bird on his left hand, and an " 'L' " on his right hand. The existence and authenticity of Maldonado's tattoos was a foregone conclusion.

From the record, it appears that the only tattoos which were not overtly displayed were the " 'L' " on Maldonado's chest, the Louis Vuitton Logo tattoos in an unspecified location, and the St. Louis Cardinals on his forearm. Assuming the admission of this evidence violated Maldonado's Fifth Amendment privilege against self-incrimination, we are convinced that any presumed error is harmless beyond a reasonable doubt. (See *Chapman v. California* (1967) 386 U.S. 18, 24 ["before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt"]; *People v. Henderson* (2020) 9 Cal.5th 1013, 1029, citing *People v. Bradford* (1997) 15 Cal.4th 1229, 1314 ["The standard is satisfied only if '[t]here is no reasonable possibility that the verdict would have been more favorable to defendant had [the] statements not been admitted' "].) There is no reasonable possibility that Maldonado would have received a more favorable verdict had evidence of these tattoos, which were presumably not visible to the jury, not been admitted at his trial.

## IV. The Exclusion of Evidence Showing that A.K. Was Facing Drug Charges

Maldonado further contends that the trial court abused its discretion by declining trial counsel's request to admit evidence of the fact that A.K., the victim of the home invasion, had a drug case pending against him. We find Maldonado's claim meritless.

### A. Background

Prior to the commence of trial, the prosecutor requested that evidence of A.K.'s pending misdemeanor and felony cases, as well as any mention of A.K.'s alleged criminal activities be excluded, because A.K. had not yet been convicted of these crimes. She also sought to exclude questions about A.K.'s involvement in selling marijuana, the possession of firearms, or the possession of firearms registered under his name.

In his motions in limine, trial counsel posited that A.K. was a "well-known drug dealer" and that he was facing felony charges for drug trafficking in Merced County.

During a hearing, Maldonado's trial counsel asserted that despite A.K.'s lack of convictions, the pending charges against him could still be pertinent for impeachment. The prosecutor replied that since A.K.'s drug charges remained unresolved, they were not relevant.

The trial court concluded that A.K.'s pending charges should be excluded and deemed irrelevant for impeachment purposes in the initial phase of the trial. However, the court commented that the issue could be revisited if A.K.'s pending charges became pertinent for impeachment. The court reserved a ruling as to whether A.K.'s charges should also be excluded during the trial's gang-related phase.

### B. Legal Principles

All relevant evidence is admissible (Evid. Code, § 350), subject to the balancing test in section 352. Evidence Code section 210 defines relevant evidence as evidence "having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." Relevant evidence includes evidence "relevant to the credibility of a witness." (*Ibid.*) Conversely, evidence is "collateral" if it " 'has no relevancy to prove or disprove any issue in the action.' " (*People v. Rodriguez, supra,* 20 Cal.4th at p. 9.)

A fact may bear on a witness's credibility and still be collateral to the case. (*People v. Contreras* (2013) 58 Cal.4th 123, 152; see, e.g., *People v. Dement* (2011) 53

Cal.4th 1, 50-52 [inmate who testified for the prosecution about witnessing a prison murder could not be impeached with collateral evidence that he had lied in court about his prior murder conviction], disapproved on other grounds in *People v. Rangel* (2016) 62 Cal.4th 1192, 1216.)

The trial court has "wide latitude" under state law to exclude impeachment evidence that is collateral and otherwise has no relevance to the action. (*People v. Contreras, supra*, 58 Cal.4th at p. 152; *People v. Ayala* (2000) 23 Cal.4th 225, 301 [" '[T]he latitude section 352 allows for exclusion of impeachment evidence in individual cases is broad. The statute empowers courts to prevent criminal trials from degenerating into nitpicking wars of attrition over collateral credibility issues' "].) "This exercise of discretion necessarily encompasses a determination that the probative value of such evidence is 'substantially outweighed' by its prejudicial, 'confusing,' or time-consuming nature." (*People v. Contreras*, at p. 152; Evid. Code, § 352.)

We review the trial court's evidentiary rulings for abuse of discretion. (*People v. Lewis* (2001) 26 Cal.4th 334, 374-375.)

### C. Analysis

Whether A.K. had pending drug charges against him was collateral to the criminal charges pending against Maldonado. The decision of whether to admit evidence of A.K.'s pending charges was therefore committed to the sound discretion of the trial court. (*People v. Contreras, supra*, 58 Cal.4th at p. 152.) To that end, we conclude that Maldonado has failed to demonstrate that the trial court abused its discretion by ruling this evidence was inadmissible.

The Attorney General asserts that the instant case in analogous to our Supreme Court's decision in *People v. Lavergne* (1971) 4 Cal.3d 735, 742 (*Lavergne*).) In *Lavergne*, a robbery case, trial counsel asked Oliver, an accomplice to the robbery who was testifying as a witness for the prosecution, where he got the vehicle used in the commission of the offense. Over the prosecutor's objection, Oliver replied that he had

bought it.  Trial counsel asked Oliver if the car was stolen.  Oliver replied that it was not.  Trial counsel then sought to impeach Oliver's credibility with testimony from the owner of the vehicle.  The prosecutor objected, and the trial court sustained the objection under Evidence Code section 352.  (*Lavergne, supra*, 4 Cal.3d at pp. 739-741.)

The Supreme Court affirmed the trial court's exclusion of evidence showing that the vehicle was stolen—a crime with which the witness had neither been charged nor convicted.  (*Lavergne, supra*, 4 Cal.3d at p. 743.)  The court recognized that "collateral matters are admissible for impeachment purposes," but that "the collateral character of the evidence reduces its probative value and increases the possibility that it may prejudice or confuse the jury."  (*Id.* at p. 742.)  The court further observed that "it appears that the defendant, on cross-examination, purposely elicited the testimony for the very purpose of impeaching the witness."  (*Id.* at p. 743.)  Recognizing that "[i]t seems apparent that the defense knew the origin of the [car] in advance," the court observed that trial counsel's questioning left Oliver in a bind.  If he answered truthfully, "the defendant would have had the benefit of the admission of an irrelevant fact which would affect [his] credibility.  But the witness denied it was stolen and defendant now wishes to bring otherwise inadmissible testimony in to impeach him."  (*Id*. at pp. 743-744.)

The court concluded: "A party may not cross-examine a witness upon collateral matters for the purpose of eliciting something to be contradicted.  [Citations.]  This is especially so where the matter the party seeks to elicit would be inadmissible were it not for the fortuitous circumstance that the witness lied in response to the party's questions."  (*Lavergne, supra*, 4 Cal.3d at p. 744.)  The court recognized that "[a] witness may have a strong reason to lie about the collateral fact which reason would furnish no motive to lie in his other testimony. Where such a situation exists, the possible inference that a witness false in part of his testimony is not to be trusted as to other parts is weakened."  (*Id.* at p. 743.)  In *People v. Lavergne*, Oliver had not been charged with the theft of the car used in

the robbery, thus, he had a motive to lie about his ownership of the car that did not exist with respect to the remainder of his testimony. (*Ibid*.)

We agree with the Attorney General that evidence pertaining to A.K.'s pending cases was a collateral issue. "[A] matter is 'collateral' if it has no logical bearing on any material, disputed issue. [Citation.] A fact may bear on the credibility of a witness and still be collateral to the case." (*People v. Contreras*, *supra*, 58 Cal.4th at p. 152.) The collateral nature of evidence is not evaluated in relation to whether it proves the existence or nonexistence of any fact attested to by a witness, i.e., its impeachment value, it is tested by its ability to prove or disprove any issue pertaining to the criminal case itself, specifically, the guilt or innocence of the defendant. (*People v. Rodriguez, supra,* 20 Cal.4th at p. 9.)

Here, the issue of whether A.K. had a pending drug case against him bore minimal relevance " 'to prove or disprove any issue in the action' " (*People v. Rodriguez, supra,* 20 Cal.4th at p. 9) and was therefore, collateral. Whether this evidence was admissible was committed to the sound discretion of the trial court, subject to the balancing test under Evidence Code section 352. (*People v. Clark*, *supra*, 52 Cal.4th at p. 931 ["A witness may be impeached with any prior conduct involving moral turpitude whether or not it resulted in a felony conviction, subject to the trial court's exercise of discretion under Evidence Code section 352."].) To that end, Maldonado has failed to demonstrate that the trial court erred by concluding that the probative value of this evidence was substantially outweighed by the probability that its admission would necessitate an undue consumption of time, create substantial danger of undue prejudice, confuse the issues, or mislead the jury.

We further observe trial counsel never offered any evidence of the conduct underlying A.K.'s arrest to show it involved moral turpitude. An arrest standing alone is generally not admissible to impeach a witness. (See *People v. Medina* (1995) 11 Cal.4th 694, 769 ["mere arrests are usually inadmissible, whether as proof of guilt or

43.

impeachment"]; *People v. Williams* (2009) 170 Cal.App.4th 587, 609 ["Generally, evidence of mere arrests that do not result in convictions is inadmissible because such evidence invariably suggests the defendant has a bad character."]; *People v. Lopez* (2005) 129 Cal.App.4th 1508, 1523 ["it is established that evidence of mere arrests is inadmissible because it is more prejudicial than probative"].)

Even assuming error however, the record does not support Maldonado's assertion that he was prejudiced by the exclusion of A.K.'s pending drug charges. The exclusion of collateral impeachment evidence does not implicate federal constitutional rights so long "as the excluded evidence would not have produced a ' " 'significantly different impression' " ' of the witness's credibility." (*People v. Contreras, supra*, 58 Cal.4th at p. 152.) Applying *Watson*, we conclude that Maldonado would not have received a more favorable outcome at trial had this evidence been admitted.

## V.     Maldonado's Claim of Sentencing Error

In his final claim on appeal, Maldonado contends that the instant case must be remanded back to the lower court for resentencing following the enactment of Assembly Bill No. 518 (2021-2022 Reg. Sess.) (Assembly Bill No. 518) to consider whether to stay his sentence on count 1 rather that his sentence on count 2. Effective January 1, 2022, "Assembly Bill No. 518 amended ... section 654 to remove the requirement that a court impose the longest sentence when a defendant is convicted of more than one offense arising from the same conduct, such that a court now has discretion to select a longer or shorter sentence when ... section 654 applies." (*People v. Lopez* (2022) 78 Cal.App.5th 459, 468.) Because the jury failed to return a verdict on count 2, and this count was struck by the trial court, remand for resentencing under Assembly Bill No. 518 is not required.

### A. Background

As relevant here, the information charged Maldonado and Kelly with robbery committed by two or more people (§ 213, subd. (a)(1)(A), count 1) and home invasion robbery (§ 211, count 2). These crimes were based upon the same acts.

The jury instructions state that "[t]he defendants are charged in Counts 1 and 2 with robbery." The jury was further instructed on the elements of "robbery in concert" the crime "charged in Count 1," and degrees of robbery, which was also relevant to count 1. The jury instructions clarified that home invasion robbery, as charged in count 2, was a lesser crime of robbery in concert, as charged in count 1. The instructions state that the court "can accept a verdict of guilty of the lesser crime only if you have found the defendant not guilty of the greater crime." The jury ultimately returned a verdict of guilty on count 1, robbery in concert.

The reporter's transcript from Maldonado's sentencing hearing shows that the trial court erroneously imposed the midterm sentence of four years on count 2, which the court stayed pursuant to section 654. The section 186.22, subdivision (b) enhancement that was originally attached to count 2 was stricken.

However, the minute order for the sentencing hearing, dated December 16, 2022, clarifies that "Subsequent to the hearing and off [of] the record, the Court dismisses Count 2 and strikes the fines as to this count." The abstract of judgment does not reflect that a sentence was imposed on count 2.

### B. Analysis

The record shows that the jury did not return a verdict on count 2 because it was a lesser included offense of count 1, and Maldonado was convicted of the greater offense. Thus, the court erred when it sentenced Maldonado on count 2. The minute order dated December 16, 2022, reflects that the court recognized its error and subsequently dismissed count 2.

45.

Generally, the oral pronouncements of the trial court are presumed correct.  (See *People v. Thompson* (2009) 180 Cal.App.4th 974, 978.)  Under certain circumstances, however, the minute order and abstract of judgment may prevail over contrary statements in the reporter's transcript.  (See *People v. Cleveland* (2004) 32 Cal.4th 704, 768; *People v. Smith* (1983) 33 Cal.3d 596, 599, quoting *In re Evans* (1945) 70 Cal.App.2d 213, 216 [" 'whether the recitals in the clerk's minutes should prevail as against contrary statements in the reporter's transcript, must depend upon the circumstances of each particular case' "].)  Such circumstances are present here, where the minute order demonstrates that the court clearly intended to correct the fact that it had erroneously imposed a sentence on count 2.  Based upon the foregoing, we conclude that there is no need to remand this matter back to the lower court for a resentencing hearing.

## DISPOSITION

The judgment of conviction is affirmed.


SMITH, J.

WE CONCUR:


LEVY, Acting P. J.


DETJEN, J.

46.